**Appeal of FTC LINE OF BUSINESS REPORT LITIGATION.**

**Appeal of FTC LINE OF BUSINESS REPORT LITIGATION AMERICAN CYANAMID COMPANY et al.**

**DEERING MILLIKEN, INC., Appellant,**

**v.**

**FEDERAL TRADE COMMISSION et al. (three cases).**

**Appeal of FTC LINE OF BUSINESS REPORT LITIGATION NL INDUSTRIES, INC.**

**Appeal of FTC LINE OF BUSINESS REPORT LITIGATION FEDERAL TRADE COMMISSION PARTIES.**

**Appeal of FTC LINE OF BUSINESS REPORT LITIGATION CYCLOPS CORPORATION.**

**Appeal of FTC CORPORATE PATTERNS REPORT LITIGATION.**

**Appeal of FTC CORPORATE PATTERNS REPORT LITIGATION AMERICAN CYANAMID COMPANY et al.**

**Appeal of FTC CORPORATE PATTERNS REPORT LITIGATION FEDERAL TRADE COMMISSION PARTIES.**

Nos. 77–1728, 77–1931, 77–1942, 77–1944, 77–1947, 77–1953, 77–1956, 77–1732, 77–1930, 77–1943 and 77–1952.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 16, 1977.

Decided July 10, 1978.

As Amended July 20, 1978.

Certiorari Denied Nov. 6, 1978. See 99 S.Ct. 362.

---

J. Randolph Wilson, Washington, D. C., with whom John S. Koch and Steven S. Rosenthal, Washington, D. C., were on the brief, for appellants Air Products and Chemicals, Inc., et al., in Nos. 77–1728 and 77–1732.

Lee A. Rau, Washington, D. C., with whom Edward T. Tait, John M. Wood and Stuart M. Gerson, Washington, D. C., were on the brief, for appellants American Air Filter Co., Inc., et al., in Nos. 77–1728 and 77–1732.

Mark A. Jacoby, New York City, with whom Ira M. Millstein and Salem M. Katsh, New York City, were on the brief, for appellants Aluminum Co. of America, et al., in Nos. 77–1728 and 77–1732.

John C. Reitz, Washington, D. C., was on the brief, for appellants American Greet-ings Corp., et al., in Nos. 77–1728 and 77–1732.

James R. Henderson, Washington, D. C., was on the brief, for appellants, Inland Steel Co., et al., in Nos. 77–1728 and 77–1732.

John F. Graybeal and Robert C. Houser, Jr., Washington, D. C., were on the brief, for appellant Square D Co., in Nos. 77–1728 and 77–1732.

Andrew S. Krulwich, Washington, D. C., was on the brief for appellant Hoffman LaRoche, in No. 77–1732, and for appellant Lone Star Industries, Inc., in No. 77–1728.

Philip J. Davis, Washington, D. C., was on the brief, for appellant Chemetron Corp., in Nos. 77–1728 and 77–1732.

James F. Rill, Washington, D. C., was on the brief, for appellant Carpenter Technology Corp., et al., in No. 77–1732, and for appellant A. E. Staley Manufacturing Co. in No. 77–1728.

James F. Bromley, Washington, D. C., was on the brief, for appellant United States Gypsum Co. in Nos. 77–1728 and 77–1732.

Ronald P. Wertheim, Washington, D. C., was on the brief, for appellant Ashland Oil, Inc., in Nos. 77–1728 and 77–1732.

Daniel K. Mayers and Neil J. King, Washington, D. C., were on the brief, for appellants The Babcock and Wilcox Co., et al., in Nos. 77–1728 and 77–1732.

William C. Collishaw, Washington, D. C., was on the brief, for appellant White Consolidated Industries, Inc., in Nos. 77–1728 and 77–1732.

Samuel K. Abrams and Wilbur L. Fugate, Washington, D. C., were on the brief, for appellants Cone Mills Corp., et al., in Nos. 77–1728 and 77–1732.

Raymond E. Vickery, Jr., Washington, D. C., was on the brief, for appellants Hughes Tool Co., et al., in No. 77–1732.

Ramsay D. Potts and Steven L. Meltzer, Washington, D. C., were on the brief, for appellant Emerson Elec. Co., in Nos. 77–1728 and 77–1732.

Milton Wolson, New York City, and S. White Rhyne, Jr., Washington, D. C., was on the brief, for appellant SCM Corp., in Nos. 77–1728 and 77–1732.

Albert R. Connelly, New York City, was on the brief, for appellant Bethlehem Steel Corp., et al., in Nos. 77–1728 and 77–1732.

Edwin S. Rockefeller and Alan M. Frey, Washington, D. C., were on the brief, for appellant Norton Simon, Inc., in Nos. 77–1728 and 77–1732.

David J. Lewis and Elroy H. Wolff, Washington, D. C., were on the brief, for appellants Thomas Lipton, Inc., et al., in Nos. 77–1728 and 77–1732.

Anthony B. Barton, New York City, was on the brief, for appellant, American Maize-Products, Co., in Nos. 77–1728 and 77–1732.

Eve E. Backrack, Washington, D. C., was on the brief, for appellant Food Fair Stores, Inc., in No. 77–1732, and for appellant C.I.T. Financial Corp., in No. 77–1728.

Coswell O. Hobbs, III, Washington, D. C., was on the brief, for American Stores Co., in No. 77–1732.

Robert J. Pope, Washington, D. C., was on the brief, for appellant Continental Group, Inc., in No. 77–1732.

Philip A. Lacavara and Gerald Goldman, Washington, D. C., were on the brief, for appellants Merck and Co., Inc., et al., in No. 77–1728.

J. Stanley Stroud, Washington, D. C., was on the brief, for appellants CPC Intern., Inc., et al., in No. 77–1728.

David B. Lytle, Washington, D. C., was on the brief, for appellant Republic Steel Corp., in No. 77–1728.

Joseph W. Burns, New York City, was on the brief, for appellant Ingersoll-Rand Co., in No. 77–1728.

Ronald G. Precup, Washington, D. C., was on the brief, for appellant American Beef Packers, Inc., in No. 77–1728.

Gilbert H. Weil, New York City, was on the brief, for Bristol-Myers Co., in No. 77–1728.

William Simon, Harold F. Baker, David C. Murchison, J. Wallace Adair, John DeQ. Briggs, III, and Stuart H. Harris, Washington, D. C., were on the brief, for appellants American Cyanamid Co., et al., in Nos. 77–1728, 77–1732, 77–1930 and 77–1931.

Robert E. Jordan, III, Washington, D. C., Edward E. Vaill, Los Angeles, Cal., and Robert M. Goolrick, Washington, D. C., were on the brief, for appellant, Atlantic Richfield Co., in Nos. 77–1728 and 77–1732.

Andrew J. Kilcarr and Vincent Tricarico, Washington, D. C., were on the brief, for appellant Mobil Oil Corp., in Nos. 77–1728 and 77–1732.

Jesse P. Luton, Jr., John E. Bailey and Kevin F. Cunningham, Houston, Tex., were on the brief, for appellant Gulf Oil Corp., in Nos. 77–1728 and 77–1732.

Paul J. Newlon, Victoria G. Traube and Michael A. Lampert, New York City, were on the brief, for appellant Milliken and Co., et al., in Nos. 77–1728, 77–1732, 77–1942, 77–1943 and 77–1944.

Leslie W. Jacobs, Akron, Ohio, was on the brief, for appellant The Goodyear Tire and Rubber Co., et al., in Nos. 77–1728 and 77–1732.

Gerald P. Norton, Deputy Gen. Counsel, Federal Trade Commission, Washington, D. C., with whom Jerald D. Cummins, Acting Asst. Gen. Counsel, Joanne L. Levine, Sophie A. Krasik, Thomas A. Sheehan, III, and Arthur W. Adelberg, Attys., Federal Trade Commission, Washington, D. C., were on the briefs, for appellees Federal Trade Commission, in Nos. 77–1728, 77–1732, 77–1930, 77–1931, 77–1942, 77–1943, 77–1944, 77–1947 and 77–1956, and cross-appellants in Nos. 77–1952 and 77–1953.

Frank A. Rosenfeld, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Barbara Allen Babcock, Asst. Atty. Gen., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee Comptroller General, in No. 77–1728.

Before BAZELON and ROBINSON, Circuit Judges, and AUBREY E. ROBINSON,

Jr.,* District Judge, United States District Court for the District of Columbia.

Opinion PER CURIAM.

PER CURIAM:

We review the decisions of the District Court granting summary judgment to the Federal Trade Commission (Commission or FTC) and enforcing the Commission's orders requiring appellant corporations to file financial performance reports as part of the Line of Business (LB) and Corporate Patterns Report (CPR) surveys.[1] These two broad-based statistical surveys are conducted by the FTC pursuant to its authority under Section 6(b) of the Federal Trade

Commission Act, which empowers the Commission to require corporations to file informational reports regarding the company's "organization, business, conduct, practices, management, and relation to other corporations."[2]

## I. THE FTC SURVEYS

### A. The Line of Business Program.

In August 1975, as part of the Line of Business survey, the Commission ordered 450 of the nation's largest domestic manufacturing concerns to file reports disclosing certain indicia of financial performance for 1974.[3] The 1974 LB form sent to each

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1970).

1. Multiple enforcement actions were brought by the Commission against companies who failed to comply with the 1974 LB and 1972 CPR orders. The actions relating to the· two surveys were assigned to Judge Flannery who consolidated them into two dockets, *In re FTC Line of Business Report Litigations*, Master File Misc. No. 76–127 and *In re Corporate Patterns Report Litigations*, Master File Misc. No. 76–126. By order dated July 30, 1976 Judge Flannery established procedures for his tandem consideration of the two programs. (LB App. 162–186) In a series of opinions and orders the District Court addressed the numerous issues raised by the parties. *In re FTC Corporate Patterns Report Litigations*, 432 F.Supp. 274 (D.C., 1977) (LB App. 187); 432 F.Supp. 291 (1977) (LB App. 211); 1977–2 Trade Cas. 72,-141 (July 11, 1977) (LB App. 239); (unreported Final Order and Judgments) (July 15, 1977) (LB App. 271; CPR App. 248); 1977–2 Trade Cas. 72,420 (July 29, 1977) (denying motion to amend).

Pursuant to the final order and judgment of the District Court entered July 15, 1977, the corporate parties were required to file their Line of Business reports within 150 days of the date of the order and the Corporate Patterns Reports within 90 days. A motion for stay of the enforcement order pending appeal was denied by the District Court on July 22, 1977 (LB App. 273) and by this court on October 21, 1977 (LB App. 274). Petition was made to the Supreme Court for a stay pending appeal in this court of the Corporate Patterns Report orders. Justice Brennan granted the petition on November 11, 1977 (CPR App. 253). Following several extensions of the compliance date in the Line of Business program, we issued ·an order on April 26, 1978 staying enforcement of the LB orders pending our further consideration of the matter.·

2. 15 U.S.C. § 46(b) (1976) states that the Commission shall have the power

To require, by general or special orders, persons, partnerships, and corporations, engaged in or whose business affects commerce, excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective persons, partnerships, and corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission.

3. A more limited Line of Business survey was conducted for 1973. The LB form served on 345 companies in the 1973 survey differed from the 1974 form. See Bureau of Economics Staff Memorandum, 1974 Form LB Revision (LB App. 782). Numerous motions to quash the 1973 orders were denied by the Commission. Preenforcement actions seeking to enjoin the 1973 survey were commenced in the District Courts of Delaware and the Southern District of New York. *Aluminum Co. of America v. FTC*, 390 F.Supp. 301 (S.D.N.Y.1975) (LB App. 89); *A. O. Smith Corp. v. FTC*, 396 F.Supp. 1108, 1125 (D.Del.1975) (LB App. 55), *rev'd*, 530 F.2d 515 (3d Cir.1976) (LB App. 121); *A. O. Smith Corp. v. FTC*, 417 F.Supp. 1068 (D.Del. 1976) (LB App. 196), 403 F.Supp. 1000 (D.Del. 1975) (LB App. 100). The Commission com-

corporate respondent consists of four schedules.[4] Schedule I seeks information identifying the company and its subsidiaries. Schedule II elicits a description of the company's lines of business. Schedule III, the heart of the form, exacts specific financial and statistical data—including revenues, costs, profits and assets—for each of the company's lines of business. Schedule IV requires reconciliation with other parts of the form and with the company's published financial data. The key feature of the survey is its requirement that each company present its financial performance statistics in terms of a uniform set of market categories.[5]

The Commission proposes to aggregate the LB statistics within each market category in order to identify areas of the economy in which profits are relatively high or low and to assess relationships between market structure and performance, and to use this information to target particular markets for industry-wide investigations into potential antitrust violations or unfair trade practices.[6] Since corporate financial performance data otherwise available to the Commission are not reported in terms of uniform market categories, the LB survey is expected to provide the only performance statistics susceptible to comparison on an industry-by-industry basis.[7] Aside from internal use of the LB data, the Commission has indicated an interest in publishing the aggregate market statistics to facilitate efforts by investors, managers and scholars to further the effectiveness of the competitive system.[8]

The Commission began developing the Line of Business form in 1970. After extended consideration and extensive revisions, a limited survey was conducted to collect 1973 data.[9] Revisions were made as a result of the Commission's experience with the 1973 survey, and in April 1975 the Commission published the proposed 1974 LB form in the Federal Register and solicited comments.[10] In addition, the FTC distributed copies of the proposed form and the Commission's supporting statement to numerous interested parties, inviting their responses.[11] On May 20, 1975, the full Commission conducted a hearing at which testimony was elicited from twenty witnesses

menced an enforcement action in New York, *FTC v. American Standard, Inc.*, Civ.No. M18–304 (S.D.N.Y. Feb. 11, 1975), but later decided to abandon enforcement of the 1973 orders when it instituted proceedings to enforce the 1974 LB and the 1972 CPR orders in the District Court for the District of Columbia. The preenforcement actions in New York and Delaware, to which claims regarding the 1974 LB and the 1972 CPR surveys had been added, were transferred to the District of Columbia. *A. O. Smith Corp. v. FTC*, 417 F.Supp. 1068, 1085–1091 (D.Del.1976) (LB App. 153–159).

Orders requiring reports for the 1975–1976 Line of Business survey have been served on 481 companies but the FTC has not instituted enforcement proceedings (LB App. 957).

4. FTC Form LB (LB App. 735). See Instructions, Form LB, General (LB App. 748).

5. The FTC has developed, based on the Office of Management and Budget's Standard Industrial Classification system, 260 four-digit codes which define manufacturing market categories (LB App. 765).

6. Federal Trade Commission, Annual Line of Business Report Program, Statement of Pur-

pose (LB App. 308) (hereinafter cited as LB Statement of Purpose); Supporting Statement, FTC Form LB, 1974 Survey Version, Federal Trade Commission (July 1, 1975) (LB App. 715) (hereinafter cited as LB Supporting Statement).

7. LB Supporting Statement, *supra* note 6, at 4 (LB App. 719).

8. *Supra* note 6.

9. The 1973 LB form was the subject of public hearings by the Office of Management and Budget (see Minutes, LB App. 2601), and notice and comment review by the Comptroller General (see Report to the Comptroller General of the United States on the Evaluation of the Federal Trade Commission's Proposed Annual Line of Business Report, May 10, 1974, at 3, LB App. 403).

10. 40 Fed.Reg. 17081 (April 16, 1975).

11. Letter from William F. Long, Manager, Line of Business Program (April 15, 1975) (LB App. 2297); LB Supporting Statement, *supra* note 6, at 9–10 (LB App. 723–724).

regarding the proposed LB program.[12] After considering the nearly 100 comments received and the testimony presented, the FTC revised the LB form and submitted it to the General Accounting Office (GAO) for clearance under the Federal Reports Act.[13] Notice was published again in the Federal Register and comments were solicited by the GAO.[14] Upon consideration of the comments received, the GAO approved the LB form for use by the FTC in a letter detailing its deliberations.[15] The Line of Business orders were subsequently served on approximately 450 corporations.[16] Motions to quash the LB orders were made by 180 companies[17] and denied by the Commission in a statement responding to the objections advanced by the corporations.[18]

B. *The Corporate Patterns Report Program.*

The Corporate Patterns Report survey requires over 1100 major domestic corporations to report the value of shipments from their domestic manufacturing establishments in 1972, in terms of product classifications developed by the Census Bureau for use in the Quinquennial Census of Manufactures.[19] The CPR survey also solicits 1972 data regarding, *inter alia*, consolidated net manufacturing activities and major acquisitions and disposals since 1972.[20] As with the LB program, the FTC proposes to use the CPR survey to create a data bank on market structures for use by the Commission in antitrust enforcement, economic analysis and policy planning.[21] The value of shipments data will be used in conjunction with aggregate data published by the Census Bureau based on similar information contained in the 1972 Census of Manufactures.[22]

The Corporate Patterns Report survey was considered initially by the Commission in 1972.[23] After testing the proposed form on a small number of companies and effecting some modifications,[24] the FTC submitted the CPR form to the General Accounting Office for clearance as required under the Federal Reports Act. The GAO published notice of the proposed survey in the Federal Register and solicited comments.[25] The comments received were duly considered, and the GAO approved the CPR

12. Transcript of Public Hearing on Proposed FTC Form LB for Use in Collecting 1974 Line of Business (May 20, 1975) (LB App. 1435).

13. Letter from Virginia M. Harding, Acting Secretary of the FTC, to Elmer B. Staats, Comptroller General of the United States (July 1, 1975) (LB App. 2025).

14. 40 Fed.Reg. 28677 (July 8, 1975).

15. Letter from Monte Canfield, Jr., Director, General Accounting Office, to FTC Chairman Lewis A. Engman (August 18, 1975) (LB App. 798).

16. Order to File Special Report, 1974 Form LB (August 20, 1975) (LB App. 804).

17. *E. g.,* Joint Motion to Quash Orders to File Special Reports and for Other Appropriate Relief filed September 2, 1975, on behalf of A. O. Smith Corp., *et al.* (LB App. 853; Motion of C.I.T. Financial Corporation to Quash Order to File Special Report and Memorandum in support thereof, filed September 22, 1975 (LB App. 2421). For a list of companies which filed motions to quash, see Appendix I to FTC Petition for Enforcement, "Motions to Quash LB Orders Filed with the Federal Trade Commission by Respondents" (LB App. 2547).

18. Statement of the Commission on Motions to Quash the Orders to File the 1974 Line of Business Form (LB App. 878).

19. Corporate Patterns Report for 1972, FTC Form CPR–1 (CPR App. 305), FTC Form CPR–2 (CPR App. 318), FTC Form CPR–S (CPR App. 322); Supporting Statement for the Federal Trade Commission's Corporate Patterns Report (Dec. 31, 1974) (CPR App. 256) (hereinafter cited as CPR Supporting Statement).

20. *Supra* note 19.

21. CPR Supporting Statement, *supra* note 19, at 2 (CPR App. 257).

22. *Id.* at 4 (CPR App. 259).

23. See FTC CPR Brief at 9.

24. Supplemental Statement for the Federal Trade Commission's Corporate Patterns Report (December 23, 1974) at 12–13 (CPR App. 267–268).

25. 40 Fed.Reg. 4689 (Dec. 31, 1975).

form in a letter to the FTC detailing the substance of these comments.[26] In addition to entertaining the comments supplied by the GAO, the FTC conferred with representatives from the Census Bureau and the Office of Management and Budget in a public meeting in June 1975[27] and less formally on other occasions. In July 1975 the Commission adopted a resolution authorizing the use of compulsory process,[28] and the Corporate Patterns Report orders were served on 1100 companies.[29] In response, motions to quash were filed by 390 companies raising numerous factual and legal objections.[30] In an effort to accommodate corporate claims, the Commission deleted an unduly burdensome requirement that each company rank itself as to each product category and responded to each of the corporations' objections in a letter denying the motions to quash.[31]

## II. DISCUSSION

Enforcement actions were commenced in the District Court against the companies that had refused to comply with the Commission's orders.[32] Dissatisfied in several respects with the disposition rendered by the trial court, the corporations perfected this appeal. Appellants contend first that the orders in both the LB and CPR surveys were issued in violation of the rulemaking requirements of the Administrative Procedure Act (APA).[33] Second, appellants urge that the CPR survey is invalid because it violates the confidentiality provisions of the Census Act.[34] Third, appellants assert both substantive and procedural errors by the

District Court in the enforcement proceeding.[35] Finally, appellants submit that the LB orders are infirm because of the alleged failure of the Comptroller General to review the LB forms in accordance with the requirements of the Federal Reports Act.[36] We address each of these contentions in turn.

### A. Lawfulness of the FTC Report Orders.

#### 1. Nonapplicability of the Administrative Procedure Act's Rulemaking Requirements.

The Federal Trade Commission Act (FTC Act)[37] provides a clear basis of authority for the Commission to issue orders requiring corporations to submit informational reports to the FTC. Section 6(b) of the Act states that the Commission shall have the power

> To require by general or special orders, persons, partnerships, and corporations, engaged in or whose business affects commerce, excepting banks and common carriers subject to the Act to regulate commerce or any class of them or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective persons, partnerships, and corporations

26. Letter from Monte Canfield, Jr., Director of GAO, to FTC Chairman Engman (March 24, 1975) (CPR App. 778).

27. Meeting Notes (June 12, 1975) (CPR App. 984).

28. FTC Resolution Authorizing and Directing the Collection of Economic Reports (July 29, 1975) (CPR App. 299).

29. See FTC Order to File Special Report addressed to Allen-Bradley Co. (July 29, 1975) (CPR App. 304).

30. FTC CPR Brief at 11.

31. Statement of the Commission, Motions to Quash, Corporate Patterns Special Report (CPR App. 455).

32. See note 1, *supra.*

33. See discussion in text *infra* at notes 37–55.

34. See discussion in text *infra* at notes 56–86.

35. See discussion in text *infra* at notes 89–143.

36. See discussion in text *infra* at notes 144–159.

37. 15 U.S.C. §§ 41 *et seq.* (1976).

filing such reports or answers in writing.[38]

Appellants claim that the Commission's exercise of this authority, which they do not challenge,[39] in the development and implementation of the Line of Business and Corporate Patterns Report surveys was procedurally improper because the Commission failed to comply with the rulemaking requirements of the Administrative Procedure Act.[40]

■ Our first inquiry is whether the Federal Trade Commission Act obligates the Commission to observe APA rulemaking procedures when exercising its authority to require informational reporting pursuant to Section 6(b) of the FTC Act. We conclude that neither Section 6(b) nor any other section of the FTC Act requires adherence to the APA's rulemaking procedures nor does any section of the Act prescribe other procedural prerequisites to the exercise of the Commission's authority to require reporting. Section 6(b) states that the Commission by order may require corporations "to

file with the Commission in such form as the Commission may prescribe . . . reports or answers in writing to specific questions, furnishing the Commission such information as it may require. . . ."[41] This section assuredly imposes no procedural qualification on the exercise of the Commission's authority to gather information. Section 6(g) of the FTC Act empowers the Commission to make rules and regulations for the purpose of carrying out the first eighteen sections of the Act.[42] But this section does not *require* that the FTC engage in rulemaking to implement 6(b) or any other section.[43] Rather, 6(g) simply authorizes the Commission to promulgate rules and regulations if it so desires. This is confirmed by the fact that the first eighteen sections include the subpoena authority of the FTC,[44] the exercise of which is not subject to rulemaking requirements.[45] Hence, Section 6(g) in no wise impugns the Commission's prerogative to order reporting pursuant to Section 6(b) without preliminarily pursuing rulemaking procedures.[46]

**38.** *Id.* § 46(b).

**39.** During oral argument, counsel for appellants stated that the corporations were not "faulting with the power" of the Commission to conduct the Line of Business and Corporate Patterns Report surveys, but rather challenging only the alleged "procedural unfairness" of the way in which the Commission has exercised its authority.

**40.** 5 U.S.C. § 553 (1976).

**41.** *Supra* note 38.

**42.** 15 U.S.C. § 46(g) (1976) provides that the Commission shall have power "to make rules and regulations for the purpose of carrying out the provisions of section 41 to 46 and 47 to 58 of this title."

**43.** See *National Petroleum Refiners Ass'n v. FTC,* 157 U.S.App.D.C. 83, 88, 482 F.2d 672, 677 (1973), *cert. denied,* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974).

**44.** 15 U.S.C. § 49(a) (1976).

**45.** See, e. g., *FTC v. Lonning,* 176 U.S.App.D.C. 200, 539 F.2d 202 (1976).

**46.** Appellants rely heavily on the fact that the Securities and Exchange Commission and the Federal Power Commission have engaged in rulemaking in the development of information-

gathering programs as support for the claim that the Federal Trade Commission should be required to conduct rulemaking proceedings prior to implementation of the LB and CPR programs. In our view, appellants' reliance is misplaced. The statute enabling the SEC to establish reporting requirements is substantially different from the Federal Trade Commission's governing legislation. The statutory provisions empowering the SEC to impose reporting requirements on corporations expressly provide that the SEC may do so only by the promulgation of rules and regulations in accordance with the Administrative Procedure Act. See, *e. g.,* 15 U.S.C. §§ 77s(a), 78m(a) (1976).

The Natural Gas Act authorizes the Federal Power Commission to require natural gas companies to file annual or special reports and, analogously to the FTC Act, does not expressly confine the FPC's information-gathering authority to the issuance of rules and regulations. Rather, 15 U.S.C. § 717i(a) (1976) provides, in part, that

[e]very natural-gas company shall file with the Commission such annual and other periodic or special reports as the Commission may by rules and regulations or order prescribe as necessary or appropriate to assist the Commission in the proper administration of this chapter.

Nonetheless, in a recent exercise of its power to require reporting, the FPC *elected* to conduct

■ Similarly, the Administrative Procedure Act [47] does not independently require rulemaking prior to the issuance of FTC informational report orders. The language and legislative history of the APA suggest a classification of agency activity into three basic categories: rulemaking, adjudication and investigation. The issuance of agency

rulemaking proceedings in accordance with the requirements of the APA. See *Union Oil Co. v. FPC,* 542 F.2d 1036, 1040 (9th Cir. 1976). Thus appellants derive no support from the examples of the SEC and FPC reporting programs.

**47.** 5 U.S.C. §§ 551 *et seq.* (1976).

**48.** We reject appellants' argument that the LB and CPR programs fall within the APA's definition of a "rule," 5 U.S.C. § 551(4) (1976), and are therefore subject to the APA's rulemaking requirements, *id.* §§ 551(5), 553. The APA defines a "rule" as:

the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future or rates, wages, corporate or financial structures of reorganizations thereof, prices, facilities, appliances, services, or allowances therefor or of *valuations, costs, or accounting, or practices bearing on any of the foregoing.*

*Id.* § 551(4). Appellants make two arguments. First, appellants maintain that since the LB and CPR data will be used for regulatory purposes, the collection of the data itself is a prescription of law or policy within the meaning of the rule definition. We agree with the District Court that appellants' argument proves too much. 432 F.Supp. at 302. If the collection of information is considered a prescription of law or policy because of the possible regulatory uses to which the information may be put, then all types of compulsory process the product of which may be put to regulatory use—including subpoenas—would similarly require rulemaking.

Appellants' second argument, which applies only to the LB program, is that the LB reporting requirements constitute "approval or prescription for the future of . . . valuations, costs, or accounting, or practices bearing on any of the foregoing" within the terms of the APA's rule definition. But as the District Court determined, "the corporate parties can hardly claim that the present orders have prescribed accounting methods, since the present orders seek data from years past . . . ." 432 F.Supp. at 301. Since the LB instructions allow corporations to provide estimates or incomplete information when underlying data is unavailable, the corporations cannot reason

orders to compel the filing of informational reports was plainly regarded an investigative act by the drafters of the APA, not a rule [48] or adjudication. Congressman Walter, a principal sponsor of the APA, described investigative activity in the following terms during floor debate in the House of Representatives:

ably assert that they are unable to satisfy the LB requirements under their current accounting and recordkeeping systems. Line of Business Form, Instructions, General at 2 (LB App. 749).

Appellants nevertheless contend that the LB program prescribes accounting practices for the future because the "natural and practical results" of the reporting requirements will be transformations of the corporations' accounting and recordkeeping practices. Since many corporations do not maintain financial records on the basis of the market classifications used in the LB program, corporations may decide to alter their future accounting practices to facilitate potentially recurring LB reporting obligations. But any adjustment undertaken by the corporations will be *entirely voluntary and not* at the express behest of the FTC. To the contrary, the Line of Business Form Instructions state expressly that "reporting corporations need not develop new accounting systems or substantially rework data processing procedures in order to complete the LB Form" *Id.* Moreover, the decision of any company subject to the LB orders to modify its accounting practices would most likely be based upon the company's prediction that it will be subject to sub*stantially similar LB reporting requirements in* future years and that an alteration in accounting methods would significantly ease the burden of compiling and certifying responses. See Evidentiary Hearing Before the District Court for the District of Columbia, June 16 and 17, 1977, Testimony of Howard Siers for Dupont Company, Transcript at 71 (LB App. 1080); Testimony of John Spellman for Grace Company, Transcript at 346, 361 (LB App. 1320, 1335). Yet the Commission has made no final decision *to repeat the LB program in its present form on* an annual basis, although it has the authority to do so. In fact, the Commission has indicated that it will reconsider the present market categories on the basis of the data it receives from the first fully-enforced survey and in light of the recently developed market classification guidelines of the Financial Accounting Standards Board. FTC Memorandum dated May 9, 1977, soliciting comments on revision of 1974 LB Form (LB App. 994). Accordingly, we conclude that neither the LB program nor the CPR survey is embraced by the APA's definition of a "rule."

**696**

The third type of administrative compulsory power may be incidental to either legislative or judicial powers of administrative agencies, or it may be entirely independent of either. I refer to the compulsory action of administrative agencies when they issue subpoenas, require records or reports, or undertake mandatory inspections. These functions are investigative in nature.[49]

Investigative acts, specifically including report orders, are encompassed in Section 6(c) of the APA, which states "process, requirement of a report, inspection, or other investigative act or demand may not be issued, made, or enforced except as authorized by law."[50] Section 6(c), then, manifestly applies to the surveys in issue, which exact informational reports from selected corporations. Thus, that provisions's limitation that investigative orders "may not be issued, made, or enforced except as authorized by law" has direct bearing on this litigation. That phrase, however, simply refers to the statute authorizing the activity. In this case, the enabling statutory provision is Section 6(b) of the FTC Act, which, as we demonstrated above, does not impose rulemaking upon the FTC.[51] Accordingly, the Commission is not obligated under the Administrative Procedure Act to pursue rulemaking proceedings prior to implementation of the LB and CPR programs.

Our determination that these statistical surveys are investigative in character and therefore not subject to rulemaking procedures is buttressed by an earlier decision of this court in *Montship Lines, Ltd. v. Federal Maritime Board*,[52] which held that notice and hearing was not a prerequisite to the issuance of an industry-wide order by the Federal Maritime Board requiring the filing of statistical reports. In the same vein, the Fifth Circuit, in *United States v. W. H. Hodges & Co.*,[53] rejected the argument that the Secretary of Agriculture was subject to rulemaking requirements in directing stockyard marketing agencies to file special reports pursuant to a statutory authority that incorporates Section 6(b) of the FTC Act. The Court stated:

> The order at issue here was clearly investigatory in nature, as opposed to an adjudicatory or rulemaking process, and hence not subject to the procedures governing rule-making outlined in the APA. *Cf. Genuine Parts Co. v. F.T.C.*, 445 F.2d 1382, 1388 (5th Cir. 1971); K. Davis, *Administrative Law Treatise*, § 3.01 at 159, n.1 (1958).[54]

The LB and CPR surveys, too, are "clearly investigatory in nature" and just as plainly exempt from the Administrative Procedure Act's compulsory rulemaking requirements.[55]

**49.** 92 Cong.Rec. 5648 (1948).

**50.** 5 U.S.C. § 555(c) (1976).

**51.** Our view comports with the Commission's interpretation of the procedural requirements of the Federal Trade Commission Act and the Administrative Procedure Act. The Commission has stated:

> It has been the Commission's long-standing interpretation of the interrelationship of the APA and the FTC Act that the Commission is not required to follow the APA procedures for rulemaking when the Commission decides to use its powers under Section 6, 15 U.S.C. § 46, or other provisions of the FTC Act, to gather information or to investigate.

Statement of the Commission on Motions to Quash the Orders to File the Line of Business Form at 11 (December 19, 1975) (LB App. 888). Deference is due an agency's interpretation of its own mandate and, to a lesser extent, to its interpretation of the Administrative Procedure Act. *International Telephone & Telegraph Corp. v. Local 134, International Brotherhood of Electrical Workers*, 419 U.S. 428, 441, 95 S.Ct. 600, 609, 42 L.Ed.2d 558, 569 (1975).

**52.** 111 U.S.App.D.C. 160, 295 F.2d 147 (1961).

**53.** 533 F.2d 276 (5th Cir. 1976).

**54.** *Id.* at 278.

**55.** Appellant corporations contend, nonetheless, that the Commission developed the Line of Business and Corporate Patterns Report programs "behind closed doors" and in contravention of sound public policy. Appellants' characterization of the FTC's procedure finds no support in the record. The Commission provided substantial opportunity for public input and made a conscientious effort to be responsive to the numerous comments, complaints and criticisms proffered by corporations, experts and other branches of the government. Although the corporations have not always approved of the Commission's resolution of their

2. Confidentiality Provisions of the Census Act.

■ We next consider whether the Corporate Patterns Report Program impermissibly affronts the Census Act.[56] Specifically, appellants contend that the CPR survey violates the confidentiality provision of the Census Act, which safeguards company-retained copies of census reports from compelled disclosure to any government agency.[57] Appellants insist that this provision protects not only the actual file copy of the census report, but also the company's statistical data that has been prepared in an assertedly "unique fashion" for the purpose of reporting to the Census Bureau.[58] The corporations argue that the Census Act's protection of retained census report copies insulates companies from any future requirement to respond to questions similar to those which the company has already answered in reports to the Census Bureau.

Since the CPR survey includes a question essentially identical to an item on the Census Bureau's 1972 Annual Survey of Manufactures,[59] appellants contend that the FTC is demanding information which the Census Act protects from compelled disclosure.

Both the CPR survey and the 1972 Survey of Manufactures require the respondent corporation to report the value of shipments[60] from its domestic manufacturing establishments during 1972 in terms of product categories developed by the Census Bureau.[61] The Commission plans to assess "the position of firms and of competitive conditions in various product markets" by comparing the CPR individual company value-of-shipments aggregates from the Survey of Manufactures.[62] To maximize the comparative value of the CPR information, the FTC has concededly utilized definitions and product-class codes similar to those employed by Census.[63]

objections to the Line of Business and Corporate Patterns Report surveys, appellants' claim that they have been denied an opportunity to present their views to the Commission is, in our view, untenable. In any event, the Commission exercised its discretion to permit greater procedural access to the decision-making process involved in developing the LB and CPR programs than was required. See *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460, 467 (Sup.Ct. April 3, 1977).

**56.** 13 U.S.C. §§ 1 *et seq.* (1976).

**57.** *Id.* § 9(a)(3).

**58.** Appellants seek to extend the Census Act's protection to "statistical information specially prepared for and submitted to the Census Bureau" that is "not prepared or maintained in the ordinary course of business." Joint Appellants' CPR brief at 15–16.

**59.** See note 63 *infra.*

**60.** "Value of shipments" is defined by the Census Bureau and the FTC as "the value of products shipped for sale or transfer to other plants of the company which were manufactured, fabricated, processed or assembled" by the company. Census Instructions for completing the Annual Survey of Manufactures Report, 1973 at 7 (CPR App. 386); FTC Reference List for use in completing the Federal Trade Commission Corporate Patterns Report at 7–8 (CPR App. 333–334).

**61.** *Compare* Item 9 of Census Form MA–100 (1973) (CPR App. 381), *with* Item 5 of FTC Form CPR–1, Corporate Patterns Report for 1972 (CPR App. 305).

The product-class codes utilized in the CPR survey are the five-digit codes developed by the Census Bureau in 1972 based on the Standard Industrial Classification system. Census of Manufactures: 1972 Numerical List of Manufactured Products (New (1977) SIC Basis). Series MC 72–1–12. The Annual Census of Manufactures for 1972 required reporting on the basis of product-class codes developed by the Census Bureau in 1967. Prior to publication of the 1972 data, however, the Census Bureau converted the survey results into the 1972 code classifications. The Census form for the Annual Survey of Manufactures for 1973 was sent to companies with each company's value of shipments for 1972 converted into the 1972 code classifications.

**62.** FTC Resolution Authorizing and Directing the Collection of Economic Reports (Dec. 17, 1974) (CPR App. 254). See Comments prepared by Commission's Bureau of Economics staff on questions raised by staff of the General Accounting Office and discussed at meeting of March 11, 1975 (March 19, 1975) at 2 (CPR App. 283).

**63.** FTC CPR Brief at 29. The inquiries are not identical in several respects. The CPR survey requires reporting in terms of the Census Bureau's revised 1972 product codes, whereas reporting for the Annual Survey of Manufactures for 1972 was done in terms of the 1968 codes.

The confidentiality provision of the Census Act upon which appellants rely, Section 9(a)(3), is explicit in identifying the subject of its protection as "copies of census reports which have been retained." [64] It states that

[n]o department, bureau, agency, officer, or employee of the Government, except the Secretary in carrying out the purposes of this title, shall require, for any reason, copies of census reports which have been retained by any such establishment or individual. Copies of census reports which have been so retained shall be immune from legal process, and shall not, without the consent of the individual or establishment concerned, be admitted as evidence or used for any purpose in any action, suit, or other judicial or administrative proceeding. [65]

This language unambiguously protects actual file copies of census reports retained by corporations. In fact, appellants' construction extends so far beyond the statute's

plain terms that we might fairly reject it without further inquiry. In any event, an examination of the legislative history and purpose of the confidentiality provision of the Census Act equally belies appellants' assertion that the FTC's value-of-shipments inquiry is a circumvention of the Census Act's intended protection. [66]

Section 9(a)(3) was added to the Census Act in 1962 [67] in response to the Supreme Court's holding in *St. Regis Paper Co. v. United States* [68] that a company's retained copy of its census form was not immune from compulsory disclosure to the Federal Trade Commission under the then-existing confidentiality provision of the Census Act. Prior to *St. Regis*, the Act's immunity, which expressly applied only to census reports in the hands of the Census Bureau, [69] had been construed by some lower federal courts to apply with equal force to the company's retained copy. [70] The Census Bu-

See note 61 *supra*. Second, the CPR survey requires total company value-of shipments data, whereas the Census Bureau required reporting by individual establishment (plant). Finally, the CPR form requires a certification of accuracy and permits the use of estimates only where the underlying data is unavailable. (CPR App. 305). The census form permits the use of approximations and estimates which are "substantially accurate." (CPR App. 692).

**64.** 13 U.S.C. § 9(a)(3) (1976).

**65.** *Id.*

**66.** "[W]here the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended. And in such cases legislative history may not be used to support a construction that adds to or takes from the significance of the words employed. But the reasons for and the significant circumstances leading up to the enactment may be noticed in confirmation of the meaning conveyed by the words used." (citations omitted) *United States v. Missouri Pac. R.R. Co.*, 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322, 376 (1929). See also *Cass v. United States*, 417 U.S. 72, 76–79, 94 S.Ct. 2167, 2169–2171, 40 L.Ed.2d 668, 672–674 (1974); *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575, 579 (1961); *Caminetti v. United States*, 242 U.S. 470, 484, 37 S.Ct. 192, 194, 61 L.Ed. 442, 452 (1917); *March v. United States*, 165 U.S.App.

D.C. 267, 274–275, 506 F.2d 1306, 1313–1314 (1974); see generally 2A C. D. Sands, Sutherland Statutes and Statutory Construction, (4th ed. 1973) ch. 46, pp. 48–68; Murphy, *Old Maxims Never Die: the "Plain-Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts*, 75 Col.L.Rev. 1299 (1975).

**67.** Pub.L. No. 87–813, 76 Stat. 922 (1962).

**68.** 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961).

**69.** Prior to the 1962 amendment, the confidentiality provision of the Census Act stated:

(a) Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, may, except as provided in section 8 of this title—
(1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied, or
(2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or
(3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports. 68 Stat. 1013 (1954).

**70.** The decisions interpreting the scope of the Census Act's confidentiality protection prior to 1962 consistently held that the *actual forms* submitted to the Census Bureau were protected

reau had encouraged companies to preserve copies of their census reports in order to facilitate consistency in their reporting from year to year, and had expressly assured corporations that their reports would not be used "for purposes of taxation, investigation or regulation." [71] The Supreme Court in *St. Regis* held that the Census Bureau's promises could not be enforced without rewriting the Act to protect the company's retained copy of their report—a task for Congress and not the Court.[72]

In the wake of the *St. Regis* decision, and at the request of the Commerce Department,[73] Congress moved promptly to enact legislation "clarifying the intent of the Census Act." [74] In so doing, the legislative history reveals, Congress sought to accommodate both the interest of the Census Bureau in protecting the file copies of respondents' reports and the interest of the federal regulatory agencies in collecting information needed for regulatory purposes.[75] The House committee considering the amendment specifically rejected language that would have made census "information, reports and other data" immune from legal

process, thus clearly undermining appellants' assertion that Congress conferred such broad protection.[76] In its stead, Congress enacted a provision protecting only "copies of census reports which have been retained." [77] In determining not to immunize a company's census "data" and "information" from disclosure, the committee accepted the recommendation of the administration presented in a letter from the Bureau of the Budget included in the House report:

> [C]are must be taken not to extend confidentiality to such an extent as to interfere unduly with responsibilities of other agencies of Government in carrying out functions which require information. These include the antitrust acts and other regulatory acts. . . . [T]he protection to the respondent's file copy of the census reports should apply only to the file copy and not to the information itself or to other records and documents of the company . . . . [A]ny extension of confidentiality beyond the census copy would be strongly opposed by the administration. . . .[78]

---

from disclosure. *United States v. Bethlehem Steel Corp.*, 21 F.R.D. 568 (S.D.N.Y.1958) (Census prohibited from releasing to antitrust defendant reports filed by competitors); *Federal Trade Commission v. Orton*, 175 F.Supp. 77 (S.D.N.Y.1959) (FTC barred from subpoenaing schedules filed with Census Bureau).

The scope of the confidentiality provisions of the unamended Census Act in protecting the *copies* of the census form retained in the corporate files was the subject of disagreement among the federal courts. The Seventh Circuit in *FTC v. Dilger*, 276 F.2d 739 (7th Cir.), *cert. denied*, 364 U.S. 882, 81 S.Ct. 171, 5 L.Ed.2d 104 (1960), held that the retained copies did come within the purview of the Act. The Second Circuit, however, held that the company was not required to retain a copy of their filed report and that the retained file copies were therefore not secure from compelled disclosure. *St. Regis Paper Co. v. United States*, 285 F.2d 607 (2d Cir. 1960), *aff'd*, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961).

**71.** *St. Regis Paper Co. v. United States, supra* note 70, 368 U.S. at 216, 82 S.Ct. at 294, 7 L.Ed.2d at 247.

**72.** *Id.* at 218, 82 S.Ct. at 295, 7 L.Ed.2d at 248.

**73.** S.Rep.No.2218, 87th Cong., 2d Sess. (1962) (hereinafter cited as Senate Report) (CPR App.

657), U.S.Code Cong. & Admin.News 1962, p. 3188.

**74.** H.R.Rep.No.2437, 87th Cong., 2d Sess. 2 (1962) (hereinafter cited as House Report) (CPR App. 645); Senate Report, *supra* note 73, at 2 (CPR App. 658), U.S.Code Cong. & Admin. News 1962, p. 3189.

**75.** Moreover, the express provision of the Census Act requires accommodation of the interest of the federal agencies in gathering information. 13 U.S.C. § 132 (1976), states that "nothing in this title shall be deemed to revoke or impair the authority of any other Federal Agency with respect to the collection or release of information."

**76.** House Report, *supra* note 74, at 1 (CPR App. 644).

**77.** *Id.*

**78.** House Report, *supra* note 74, at 5 (CPR App. 648). See Hearings on Confidentiality of Census Reports Before the House Comm. on Post Office and Civil Service, 87th Cong., 2d Sess. (1962) (hereinafter cited as Census Hearings) at 27.

In addition, both the House and Senate reports include a letter from the Commerce Department favoring the restriction of the amendment's immunity to actual file copies and interpreting the impact that the limited protection would have on the ability of regulatory agencies to collect information. It stated:

> [T]he ability of a regulatory agency to formulate inquiries, even one identical with those asked by Census, would not be affected. The only restriction would be that the inquiry would not demand an answer by definition identical with that furnished the Census Bureau in another context and for another purpose.[79]

This distinction between a regulatory agency asking a *question* identical to that posed by the Census Bureau, which the FTC concedes it is doing,[80] and requiring an identical *answer*, which the FTC is not doing, is important, for it goes to the very purpose of affording immunity to census reports and their copies.

The legislative history of the 1962 amendment indicates two reasons why confidentiality was considered essential to candid and expeditious census reporting. First, in order to encourage prompt replies to Census questionnaires, companies are implored by the Bureau to "authorize subordinate officials to furnish information directly, without time-consuming formal clearance by comptrollers, auditors, or legal counsel con-

cerned with problems other than statistical reporting."[81] Second, due to the differences in corporate accounting practices and the unavailability of final data at the time census reports are made, respondents are encouraged to use estimates and approximations.[82] Since a company's unreviewed, estimated or preliminary answers to the Census Bureau might not be suitable for submission to regulatory agencies for uses potentially detrimental to the corporation, the Census Bureau must be able to assure respondents that they will not be required to provide another agency with answers necessarily identical to those given to the Census Bureau.[83]

The CPR survey, by presenting a question essentially identical to the Census inquiry with respect to value of shipments, does not "demand an answer by definition identical with that furnished the Census Bureau."[84] Simply put, the corporation is under no compulsion to supply the FTC with the same answer reported to Census, although it is certainly at liberty to do so.[85] While some corporations may use their census figures directly in responding to the CPR questionnaire, other corporations, by their own affidavits, have indicated that the unreviewed answers to the census inquiry are not sufficiently reliable for the certification of truthfulness required of their answers to the Federal Trade Commis-

---

**79.** House Report, *supra* note 74, at 7 (CPR App. 650); Senate Report, *supra* note 73, at 4 (CPR App. 660), U.S.Code Cong. & Admin.News 1962, p. 3191. See also Statement of Walter Ryan, Acting Chief, Office of Statistical Standards, Bureau of the Budget, Census Hearings, *supra* note 78, at 15.

**80.** See note 72, *supra*.

**81.** Letter from Luther H. Hodges, Secretary of Commerce, to Tom Murray, Chairman, Comm. on Post Office and Civil Service, House of Representatives (July 19, 1962); House Report, *supra* note 74, at 6 (CPR App. 649) Senate Report, *supra* note 73, at 3 (CPR App. 659), U.S. Code Cong. & Admin.News 1962, p. 3191.

**82.** *Id.*

**83.** See Ryan Statement, Census Hearings, *supra* note 78, at 17; Chamber of Commerce Statement, Census Hearings at 3; Federated

Department Stores Statement, Census Hearings at 51; National Ass'n of Manufacturers Statement, Census Hearings at 62. See generally Note, *The Required Report Privileges*, 56 Nw.U.L.Rev. 283, 293 (1961).

**84.** *Supra* note 79.

**85.** See Statement of the Commission, Motions to Quash, Corporate Patterns Special Report at 13 (CPR App. 467); Letter from C. A. Tobin, Secretary to the FTC, "To Whom This May Concern" (Feb. 13, 1976) (CPR App. 335); Hearings on Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriations For Fiscal Year 1977 Before the Senate Subcomm. on Appropriations, 94th Cong., 2d Sess. (1976) at 142–143 (CPR App. 617–18).

sion.[86] These latter appellants would not be inhibited in any respect from amending their census responses so as to effect full and well-considered compliance with the demands of the CPR program. It follows, then, that by merely including in the Corporate Patterns Report form a question similar to the inquiry made by the Census Bureau in the Survey of Manufactures, the Commission has not occasioned a breach of the Census Act's rigorous but carefully delineated assurance of confidentiality.

### B. Judicial Enforcement of FTC Informational Report Orders.

1. The Applicable Standards of Review.

▉ Section 9 of the Federal Trade Commission Act[87] vests jurisdiction in the district courts to command compliance, by mandamus, with FTC informational report orders issued pursuant to Section 6(b) of the FTC Act.[88] Prior to commanding compliance with the LB and CPR orders, the District Court reviewed these FTC pro-

grams under the criteria and summary procedures applicable to judicial enforcement of compulsory process by administrative agencies set forth by the Supreme Court in *United States v. Morton Salt Co.,*[89] and by this court in *FTC v. Texaco, Inc.*[90] Appellants contend that a higher standard of review and a plenary review preceding was required on the theory that the LB and CPR programs are "agency action" subject to the arbitrary and capricious standard of Section 706(2) of the Administrative Procedure Act.[91] We reject this argument because in our view the limited scope of review found by the Supreme Court and this court to be appropriate for compulsory process enforcement is applicable to enforcement of the Section 6(b) report orders being enforced in this proceeding.

In *United States v. Morton Salt Co.,*[92] the Supreme Court reviewed Federal Trade Commission orders requiring salt producers to file informational reports designed to determine whether these corporations were complying with a court order to cease and

86. Affidavit of Cargill, Inc. at 4–7 (CPR App. 723–726); Affidavit of Northwest Industries, Inc. at 3 (CPR App. 740); Affidavit of Goodyear Tire & Rubber Co. at 2–3 (CPR App. 733–734).

87. 15 U.S.C. § 49 (1976), which states, in part, that "the district courts of the United States shall have jurisdiction to issue writs of mandamus commanding any person, partnership, or corporation to comply with the provisions of this subchapter or any order of the Commission made in pursuance thereof."

88. 15 U.S.C. § 46(b) (1976).

89. 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

90. 180 U.S.App.D.C. 390, 555 F.2d 862 (en banc), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977). See 432 F.Supp. at 313–316 for the District Court's analysis.

91. 5 U.S.C. § 706(2) (1976). The District Court solicited supplemental memoranda on the agency action issue, and concluded that the LB and CPR programs are not "agency action" within the meaning of Section 706(2), and even if so considered, are not arbitrary, capricious, an abuse of discretion, or otherwise not in conformance with the standards of this Section. 1977–2 Trade Cas. at 72,143–72,146. As the District Court stated,

The court has a limited role to play, however, in reviewing agency action to determine whether it is arbitrary or capricious. This court cannot merely substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Rather, after a searching and careful inquiry, the court should determine whether the decision is based on a consideration of the relevant factors and whether there has been a clear error of judgment.

*Id.* at 72, 146. We agree with the District Court that the record of the administrative consideration of the LB and CPR programs reflects an extensive consideration of the problems posed by the development of these surveys. In addition, we reject as frivolous appellants' assertion that the District Court's ruling was procedurally deficient because it ruled on appellants' challenge to the composition of the administrative record at the same time it rejected appellants' claim of arbitrary and capricious agency action. Since the District Court rejected appellants' claim that the administrative record was incomplete, there was no change in the composition of the record which could possibly have prejudiced appellants in their ability to present their arguments with respect to the agency action issue.

92. *Supra* note 89.

desist certain unfair trade practices. These FTC orders were issued pursuant to Section 6(b) of the Federal Trade Commission Act, the same authority invoked by the Commission here. Appellants, nevertheless, would have us find *Morton Salt* inapposite because the report orders in *Morton Salt* were part of a focused FTC investigation, whereas the LB and CPR orders are incident to general statistical surveys. The FTC's authority to require reports under Section 6(b) is not limited to pursuing a focused theory of unlawful activity. The Supreme Court in *Morton Salt* discussed the nature and scope of this authority in some detail.

> The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.[93]

The Court went on to state that the purpose of the investigation may be nothing more than to satisfy "official curiosity," because "law enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest."[94] Indeed, as we noted in *FTC v. Texaco, Inc.*, the investigative power of the Commission may be used to reveal the need for changes in the law for the purpose of making recommendations to Congress.[95] The Commission's purpose in conducting the LB and CPR surveys falls clearly within the purview of its broad investigative powers under Section 6(b). The objective of the Line of Business program is described in the following Commission statement:

> [T]he Federal Trade Commission has made a vigorous effort in recent years to improve the effectiveness of its law enforcement resources allocations for antitrust and consumer protection. One consequence has been a shift toward investigations and cases which are industry-wide in scope. To choose as wisely as possible which industry-wide investigations best serve the public interest, accurate industry-by-industry performance information is needed. The Commission's efforts in this respect have been hampered by the decline over time in the quality of the information available. The Line of Business program was conceived to help fill those information needs.[96]

Similarly, the Commission states that the CPR data banks will be used for "enforcement efforts, economic studies, and policy planning activities."[97] Thus, as to both programs, the FTC seeks to establish data banks for use in targeting areas for investigating and enforcement efforts.

Although the investigative powers of the regulatory agencies are broad, they are not unlimited, and are subject to judicial review "[t]o protect against mistaken or arbitrary orders."[98] As we stated in *Texaco*, however, "while the court's function is 'neither minor nor ministerial,' *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. at 217 n.57, 66 S.Ct. 494, 90 L.Ed. 614, the scope of issues which may be litigated in an enforce-

---

93. *Id.* at 642–643, 70 S.Ct. at 363–364, 94 L.Ed. at 410–411.

94. *Id.*

95. 15 U.S.C. § 49 (1976). See *FTC v. Texaco, Inc.*, *supra* note 90, 180 U.S.App.D.C. at 403 n. 28, 555 F.2d at 875 n.28.

96. LB Supporting Statement, *supra* note 6, at 2 (LB App. 717).

97. CPR Supporting Statement, *supra* note 19, at 2 (CPR App. 257).

98. *United States v. Morton Salt Co.*, *supra* note 89, 338 U.S. at 640, 70 S.Ct. at 362–363, 94 L.Ed. at 409.

ment proceeding must be narrow, because of the important governmental interest in the expeditious investigation of possible unlawful activity."[99] The agency's investigative order, whether it is a subpoena or an information-report order, must be enforced if it does not transcend the agency's investigatory power, the demand is not unduly burdensome or too indefinite, and the information sought is reasonably relevant.

### 2. The Relevance and Burdensomeness Determinations.

The corporate appellants argue that if the FTC report orders are summarily enforceable as ordinary compulsory process, as we have concluded they are, the District Court erred in evaluating the relevance and burdensomeness of the Line of Business orders.[100] We understand appellants to make three claims. First, that the District Court failed to determine that the LB data sought was relevant to the agency's general purpose as required by *Texaco.* Second, that it was error for the District Court to decide the question of burdensomeness on the basis of five corporate affidavits and the testimony of two corporate witnesses. And finally, that the Court erred in considering relevance and burdensomeness independently.

■ As recognized in *Texaco,* relevance is to be measured against the agency's general purpose in gathering the investigative material.[101] The District Court found that

"the record in this action provides an ample basis for drawing the limited conclusion, without further evidentiary hearing, that the data sought in the LB program is not totally useless. . . ."[102] If anything, the District Court was too guarded in its assessment of the relevance of the LB data. Indeed, in our view, the record reflects that the Line of Business data sought is reasonably relevant to the Commission's general purpose of collecting corporate financial information in order to assess industry-by-industry performance and market structure.[103] As we are assured that the FTC surveys satisfy this degree of relevance, we need not decide if a lesser standard would suffice.

■ The next question is whether the District Court abused its discretion in determining that the Line of Business reporting requirements do not impose an undue burden on the respondent corporations.[104] As we indicated in *Texaco,* the onus of demonstrating that a request is unduly burdensome is the corporation's.[105] When the inquiry is conducted pursuant to a lawful purpose and the request is relevant to that objective, its reasonableness will be presumed absent a showing that compliance threatens to disrupt or unduly hinder the normal operations of a business.[106] Concerned that the administrative record was insufficient to permit resolution of the question of burdensomeness, and in view of the corporations' representations that they might lay an adequate evidentiary founda-

---

**99.** *Supra* note 90, 180 U.S.App.D.C. at 400, 555 F.2d at 872.

**100.** Appellants do not raise this objection in connection with the District Court's enforcement of the Corporate Patterns Report orders.

**101.** *Supra* note 90, 180 U.S.App.D.C. at 402, 555 F.2d at 874.

**102.** 1977–2 Trade Cas. at 72,146.

**103.** The critics of the LB program and the FTC agree that the design of the LB survey and the definition of market categories are not perfectly suited for collecting data that will infallibly reflect market conditions. But we do not hold the FTC to a standard of perfection in assessing the relevance of their effort. The complex problems of designing this type of statistical

program have been and will continue to be the focus of extensive efforts by the Commission to improve the survey. In the meantime, it is not disputed that the LB data that the FTC receives will be the only corporate financial performance data available in terms of uniform market categories. We defer to the Commission's expertise in concluding that this information is necessary and useful to performance of its regulatory responsibilities.

**104.** See *FTC v. Texaco, Inc., supra* note 90, 180 U.S.App.D.C. at 409 & n.45, 555 F.2d at 881 & n.45.

**105.** *Id.*

**106.** *Id.* at 410, 555 F.2d at 882.

tion with financial presentations from a "small number" of their group, the District Court invited the corporate parties to submit five affidavits on the cost of compliance with each of the two reporting programs.[107] In addition, a hearing was held at which all of the affiants were summoned to present oral testimony.[108] The District Court concluded that, assuming the accuracy of the most extravagant cost estimates, the costs of compliance were *de minimis* relative to the overall corporate operating budgets.[109] We think that under the circumstances appellants were extended ample opportunity to establish their claims of burdensomeness, and we are unable to perceive any error in the District Court's assessment of the inadequacy of their showing in that regard.

■ Finally, appellants have failed to persuade us that the District Court erred in its refusal to disregard the long and consistent line of authority supporting independent consideration of relevance and burdensomeness.[110]

3. Enforcement Procedures.

■ The corporations further argue that enforcement of the FTC's report orders by summary mandamus procedures violates Federal Rules of Civil Procedure 81(a)(3) and 81(b), which, they contend, require full compliance with the federal rules, including commencement of suit by the filing of a complaint and the issuance of a summons in a plenary proceeding.[111]

■ Rule 81(b) abolishes the writ of mandamus and provides that relief in the nature of mandamus may be obtained "by appropriate action or by appropriate motion." [112] It is clear that the substitution of motion and action practice for writ practice has not abolished the remedy of mandamus.[113] Appellants contend, however, that Rule 81(a)(3),[114] which permits district courts to deviate from the rules in subpoena

---

**107.** 432 F.Supp. at 315 & n.61. The corporations chose not to file affidavits with respect to the cost of complying with the CPR orders, 1977–2 Trade Cas. at 72,148.

**108.** 1977–2 Trade Cas. at 72,148. Although all five affiants were invited to present oral testimony, the corporations elected to present only two.

**109.** 1977–2 Trade Cas. at 72,151–72,152 (Findings of Fact ¶ 15).

**110.** *E. g., United States v. Morton Salt Co., supra* note 89; *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *FTC v. Texaco, Inc., supra* note 90.
The single statement of the Fifth Circuit in *Genuine Parts Co. v. FTC*, 445 F.2d 1382, 1391 (5th Cir. 1971), that the burden of compliance was particularly reasonable in light of the fact that the portion of the order objected to was "the very heart of the inquiry," does not suggest to us a change from the traditional bifurcated analysis.

**111.** Appellants have filed a supplemental brief advancing the argument that as a result of the FTC's filing a petition instead of a complaint in the District Court, "the district court never obtained subject matter jurisdiction and its final order granting mandatory relief is a nullity."
Brief by Goodyear Tire, *et al.* at 14. This argument is totally lacking in merit. The Supreme Court has stated:

We think that so long as the court's subject-matter jurisdiction actually existed and adequately appeared to exist from the papers filed, . . . any defect in the manner in which the action was instituted and processed is not itself jurisdictional and does not prevent entry of a valid judgment. See 2 J. Moore, Federal Practice ¶ 3.06[1], pp. 731–732 (2d ed. 1974).
*Schlesinger v. Councilman*, 420 U.S. 738, 742 n.5, 95 S.Ct. 1300, 1305 n.5, 43 L.Ed.2d 591, 599 n.5 (1975).

**112.** Fed.R.Civ.P. 81(b) states:
(b) Scire Facias and Mandamus. The writs of scire facias and mandamus are abolished. Relief heretofore available by mandamus or scire facias may be obtained by appropriate action or by appropriate motion under the practice prescribed in these rules.

**113.** 7 J. Moore, Federal Practice ¶ 81.07, at 81–96 (2d ed. 1975).

**114.** Fed.R.Civ.P. 81(a)(3) provides, in pertinent part:
These rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings.

enforcement cases, compels by implication full application of the rules in other types of mandamus proceedings. The Notes of the Advisory Committee belie appellants' suggestion that this rule was intended to create only a narrow exception to the comprehensive application of the rules in mandamus proceedings. The Committee stated that "although the provision allows full recognition of the fact that the rigid application of the rules in the proceedings themselves may conflict with the summary determination desired [citations omitted], it is drawn so as to permit application whenever the district court deems them useful." [115] Moreover, the decided cases are contrary to appellants' position. The District Court,[116] in rejecting the corporations' argument, followed the line of decisions in this jurisdiction [117] endorsing the position first delineated in *United States v. Associated Merchandising Corp.*:

> As a general rule, district courts do not issue directions in the nature of mandamus except in aid of jurisdiction already acquired. . . . However, where the Court was able to discover a congressional authorization for use of a writ of mandamus, it approved the issuance upon a petition of a peremptory writ. [citations omitted] By [Section 9 of the FTC Act] Congress has expressly conferred jurisdiction to issue a writ of mandamus. Therefore, it seems clear that Congress has expressly authorized the court to proceed summarily to enforce orders of the Federal Trade Commission for the production of documents.[118]

We find the very thin thread of logic offered by appellants insufficient to support their argument that summary mandamus enforcement proceedings for FTC report orders is prohibited by unyielding adherence to the Federal Rules of Civil Procedure.

### 4. Confidentiality Claims.

 Appellants ask to be excused from complying with the LB and CPR orders because of potential jeopardy to confidential information sought by the Commission if LB and CPR data or data aggregates are published.[119] The District Court held that appellants' confidentiality claims are premature prior to a final Commission decision to publish the data from these surveys and are improperly presented to the Court prior to exhaustion of administrative remedies.[120] Moreover, as noted by the District Court, even if appellants' claims were meritorious, they would not excuse compliance with the Commission order to supply information to the agency.[121] To ensure efficacious assertion of future claims with respect to the release of CPR data, the District Court issued a protective order obligating the FTC to provide ten days notice to companies prior to publication of CPR data for which confidential treatment had been requested and denied.[122] No protective order was issued with regard to the Line of Business data. We uphold the District Court in all respects.

**115.** See Notes of Advisory Committee on Rules, Fed.R.Civ.P. 81, 28 U.S.C.A. Rule 81 at 30–31 (1960).

**116.** 432 F.Supp. at 280–283.

**117.** *Emerson Electric Co. v. FTC,* Misc. No. 76–0002 (D.D.C. July 21, 1976); *FTC v. Jorgensen,* Misc. No. 75–46 (D.D.C. May 16, 1975); *FTC v. Sherry,* 1969 Trade Cas. 87,452 (D.D.C. 1969).

**118.** 256 F.Supp. 318, 321 (S.D.N.Y.1966).

**119.** 15 U.S.C. § 46(f) (1976) states that the Commission shall have the power
> [t]o make public from time to time such portions of the information obtained by it hereunder, except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use.

**120.** 1977–2 Trade Cas. at 72,146 n. 7; 432 F.Supp. at 311–312.

**121.** See *Electric Bond Co. v. SEC,* 303 U.S. 419, 438, 58 S.Ct. 678, 685, 82 L.Ed. 936, 946 (1938).

**122.** July 11, 1977 order (LB App. 269).

Relying on the Supreme Court's opinion in *FTC v. Schreiber*,[123] this court stated recently in *FTC v. Texaco, Inc.* that "it is the agencies, not the courts, which should, in the first instance, establish the procedures for safeguarding confidentiality."[124] In light of this principle, we noted as a general rule that until the subpoenaed information has been tendered to the agency and it has had the opportunity to rule on specific requests for confidential treatment, broad protective orders are "premature and improper."[125]

Appellants contend that if the Commission decides to publish aggregate Line of Business statistics that these figures may be subject to disaggregation, thereby revealing confidential individual company data. This argument is premature and improper for several reasons. First, the Commission has already promulgated regulations to ensure the confidential treatment of the 1974 Line of Business information.[126] They provide, in part, that the LB data shall be used only to compile statistical reports.[127] In addition, the FTC is required by its regulations to compile these reports in a fashion that precludes identification of individual company data.[128] The regulations further direct the Commission to develop procedures sufficient to prevent improper disclosure of LB data supplied by a

particular reporting company.[129] Appellants assertion that their individual LB data will be identifiable if LB aggregates are made public assumes that the FTC will forsake its own regulations. We reject this contention as contrary to the well-established presumption of administrative regularity.

Second, the Commission has invited reporting companies to lodge with their LB reports special requests indicating why their reported data may be especially vulnerable to identification if included in published aggregates.[130] Appellants must first exhaust their administrative avenues for relief before resorting to the courts for their remedy.[131] In light of the numerous administrative safeguards and avenues for relief, we conclude that a protective order is unnecessary and was properly denied by the District Court with respect to the Line of Business program.

In the CPR appeal, appellants contend that the CPR data constitutes "trade secrets" barred from publication by Section 6(f) of the FTC Act.[132] The District Court properly concluded that it was premature to reach the merits of appellants' trade secret claim because the Commission has made no final decision to publish individual CPR data.[133] Furthermore, as with the claims of confidentiality of the LB data, appellants

---

**123.** 381 U.S. 279, 85 S.Ct. 1459, 14 L.Ed.2d 383 (1965).

**124.** *Supra* note 90, 180 U.S.App.D.C. at 412 n. 62, 555 F.2d at 884 n. 62. See also *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–464, 82 L.Ed. 638, 643–644 (1938).

**125.** *FTC v. Texaco, Inc., supra* note 90, 180 U.S.App.D.C. at 412, 555 F.2d at 884.

**126.** *Id.*

**127.** Confidentiality Rules and Procedures for the 1974 Reporting Year, 40 Fed.Reg. 42243 (1975) (LB App. 710).

**128.** *Id.*

**129.** *Id.* In addition, the publication or release of any data submitted to the FTC is subject to a number of statutes. The FTC Act, 15 U.S.C. § 46(f) (1976), prohibits the Commission from publishing trade secrets obtained in its infor-

mation-gathering activities. It is a criminal offense for any Commission employee to make public any confidential information obtained by the Commission, 15 U.S.C. § 50 (1976); 18 U.S.C. § 1905 (1976). For discussion of precautions taken to ensure the security of LB data, see Hearings on Appropriations for the Departments of State, Justice and Commerce, the Judiciary, and Related Agencies for 1977 Before a Subcomm. of the Senate Comm. on Appropriations, 94th Cong., 2d Sess., pt. 4, at 128–130 (1976).

**130.** Statement of the Commission on Motions to Quash the Orders to file the 1974 Line of Business Form at 10 (LB App. 887); Statement of the Commission (on renewed motions to quash) at 4 (LB App. 558).

**131.** See note 124, *supra.*

**132.** 15 U.S.C. § 46(f) (1976).

**133.** 432 F.Supp. at 311–312.

may demonstrate to the FTC that their CPR data requires special protection and upon receipt of the CPR data, the Commission may rule favorably on particular pleas for confidential treatment. Since the CPR appellants' claims involve the potential release of their individual company data, the District Court decided that a protective order was appropriate "[i]n order to protect the corporate parties from any precipitous action on the part of the FTC" before appellants could exhaust their administrative remedies.[134] The District Court's order—much like the one issued by this court in *Texaco*[135]—requires the Commission to furnish ten days notice of a decision to publish individual company data.[136] Although we stated expressly in *Texaco* that such an order is not required as a general rule, we think the District Court's issuance of a protective order under the circumstances at bar was well within its discretion.[137] In sum, the trial court's disposition of the CPR appellants' trade secrets claim was unimpeachable in all respects.

5. Claims of the Adjudicative Appellants.

 Nine of the appellant corporations who are respondents in adjudicative proceedings styled *In the Matter of Exxon Corporation, et al.* and *In the Matter of Kellogg Co., et al.*[138] (hereinafter, adjudicative appellants or adjudicative corporations) raise separate claims of error with respect to the possible use of the LB and CPR data by the Commission's complaint counsel in those proceedings. The corporations' underlying assertion is that complaint counsel might obtain the LB and CPR data for use in the adjudications without complying with the Commission's discovery procedures, thereby violating appellants' rights under the due process clause, the Administrative Procedure Act and the Commission's own rules of practice. Essentially the same claim was made by one of the adjudicative appellants, Atlantic Richfield, in a case recently before this court, *FTC v. Atlantic Richfield Company.*[139] This court, concluding that there was no clear Commission determination of whether FTC rules of practice permitted access by Commission prosecutors to investigatory materials outside the discovery process, remanded the case with instructions to the Commission to interpret its own rules in the first instance.[140] The Commission on June 2, 1978, completed its task and concluded that its rules for adjudicative proceedings do not prevent access by complaint counsel to documents and information otherwise properly

---

**134.** *Id.* at 312.

**135.** 180 U.S.App.D.C. at 412, 555 F.2d at 884.

**136.** *Supra* note 130.

**137.** 180 U.S.App.D.C. at 412 n. 64, 555 F.2d at 884 n. 64.

Appellants Milliken & Company and Allen-Bradley Company have filed a supplemental brief asserting their special interest in the asserted failure of the Commission and the District Court to protect adequately the confidentiality of the LB and CPR data. These privately-held companies aver that the danger of disclosure of their financial data is especially grave because they are not subject to the SEC's reporting requirements applicable to public corporations. While there may be a unique facet to the confidentiality claims of the non-public corporations subject to the FTC surveys, these claims, like the confidentiality claims of the other appellant corporations, are nevertheless premature and without merit in this litigation.

**138.** Atlantic Richfield Company, Exxon Corporation, Gulf Oil Corporation, Mobil Oil Corporation, Shell Oil Company, Standard Oil of California, Standard Oil Company (Indiana) and Texaco, Inc. are respondents in *In the Matter of Exxon Corporation, et al.*, FTC Docket 8934. General Mills, Inc. is a respondent in *In the Matter of Kellogg Company, et al.*, FTC Docket 8883.

**139.** 185 U.S.App.D.C. 229, 567 F.2d 96 (1977).

**140.** *Id.* at 239, 567 F.2d at 106.

In *FTC v. Atlantic Richfield Co.* this court required sequestration of the investigative documents pending the Commission's interpretation of its rules as required on remand in order to ensure that discovery in the FTC adjudicative proceeding proceed according to the Commission's interpretation of its rules. 567 F.2d at 106–107. Following the issuance of *Atlantic Richfield* on July 25, 1977, the adjudicative corporations moved the District Court to amend its final order and judgment by fashion-

obtained by the Commission without leave of the Administrative Law Judge in charge of the adjudication and without notice to the adjudicative respondent.[141]

Adjudicative appellants contend that the LB and CPR orders should not be enforced as to them because of the potential for allegedly unlawful use of the LB and CPR data in the adjudicative proceedings. We agree fully with the District Court that these claims do not go to the question of enforcement because "the potential jeopardy of procedural rights in the adjudicative proceedings cannot impinge upon the FTC's right to collect the information in question, only upon the use to which the information might be put." [142] The claims presented by the adjudicative appellants relate not to their rights with respect to the Line of Business and Corporate Patterns Report surveys but rather to claimed rights in the adjudicative proceedings currently pending at the FTC. These assertions must be made first in those administrative proceedings and then pursued, if necessary, in the administrative and judicial avenues of appeal. As this court has stated clearly in *Atlantic Richfield*:

> Subsequent to the Commission's interpretation of its rules, all the legal questions which Atlantic wishes to raise will be comprehended within the *Exxon* adjudicatory proceeding, and dealt with by the Administrative Law Judge . . . . .
>
> If Atlantic is dissatisfied with the Commission's construction of its rules, Atlantic can raise these claims in the context of an appeal from the final decision of the agency in the adjudicative proceeding.[143]

The present litigation is no more appropriately suited to resolution of any claims that the corporations may wish to raise with respect to the Commission's interpretation of its rules than were the proceedings in *Atlantic Richfield*. Raising these issues at this juncture is improper, and, accordingly, we affirm the District Court's order.

### C. *The Comptroller General's Review.*

Appellants' final allegation of error is that the Comptroller General's approval of the Line of Business form [144] was defective because it was premised on a misunderstanding of the criteria for review established by Section 3512 of the Federal Reports Act.[145] This statute requires the independent regulatory agencies to submit proposals for the collection of information from ten or more persons to the Comptroller, who must review the form and advise the agency within 45 days whether it satisfies the requirements of the Federal Reports Act.

---

ing a sequestration order similar to the one issued in *Atlantic Richfield*. See 1977–2 Trade Cases 72,420 (D.D.C. July 29, 1977). In response the Commission committed to prevent access, outside normal discovery process, by complaint counsel to either the LB or CPR reports or to any unpublished aggregate data based on such reports pending the Commission's interpretation of its rules. Letter from Carol M. Thomas, Secretary to the FTC, to Robert G. Jordon, III (July 29, 1977) (LB App. 2781). We agree with the District Court that the FTC's voluntary commitment to sequester the LB and CPR data to the same extent required by this court's order in *Atlantic Richfield* was adequate.

**141.** *In the Matter of Subpoena Duces Tecum Addressed to Atlantic Richfield Co., et al.*, FTC Docket No. 741–0019.

**142.** 432 F.Supp. at 313. See note 121, *supra*.

**143.** *Supra* note 139, 185 U.S.App.D.C. at 240, 567 F.2d at 107.

**144.** The Corporate Patterns Report form was submitted to the Comptroller General by the Federal Trade Commission on January 23, 1975. The Comptroller published a notice of the proposed survey in the Federal Register on January 31, 1975, 40 Fed.Reg. 4689, soliciting written comments from all interested parties. In a letter dated March 24, 1975 from Monte Canfield, Jr., Director of the General Accounting Office, to FTC Chairman Lewis A. Engman, the CPR form was cleared for use by the FTC (CPR App. 777). Although the GAO expressed concern about the "meaningfulness" and confidentiality of the CPR data sought, it did not consider these reservations to be a basis for denying clearance under the review provisions of the Federal Reports Act.

The corporate parties raise no objection to the Comptroller's clearance of the CPR form.

**145.** 44 U.S.C. § 3512 (Supp. V 1975).

██ The Comptroller construes Section 3512 of the Federal Reports Act as establishing two criteria for review of data-collection plans. These two criteria are set forth in Section 3512(b), which states:

> In carrying out the policy of this section, the Comptroller General shall review all existing information gathering practices of independent regulatory agencies as well as requests for additional information with a view toward—
>
> (1) avoiding duplication of effort by independent regulatory agencies, and
>
> (2) minimizing the compliance burden on business enterprises and other persons.[146]

In approving the LB form, the Comptroller specifically found that the information sought was not available to the FTC from another federal source and that the Commission had sufficiently minimized the respondents' burden of compliance with the reporting requirement.[147]

██ Appellants argue that the Comptroller was obliged to determine additionally that the data sought was "appropriate" to the FTC's expressed need. This third criterion of review, appellants contend, is imposed implicitly by Section 3512(d) of the Federal Reports Act, which states:

> While the Comptroller General shall determine the availability from other Federal sources of the information sought and *the appropriateness of the forms for the collection of such information*, the independent regulatory agency shall make the final determination as to the necessity of the information in carrying out its statutory responsibilities and whether to collect such information. (emphasis added)[148]

The determination of appropriateness in this context, appellants suggest, should entail a substantive evaluation of the requested data to establish that it meets "some minimum standard of meaningfulness and reliability in terms of the agency's stated need."[149] We find appellants' argument at odds with both the language and the legislative history of Section 3512 of the Federal Reports Act.

Section 3512 was added to the Federal Reports Act in 1973 to create a special review procedure for the data-collection

---

**146.** *Id.* § 3512(b). Great weight must be given to an agency's interpretation of its statutory mandate. See *Chemehevi Tribe of Indians v. FPC*, 420 U.S. 395, 409–410, 95 S.Ct. 1066, 1075–1076, 43 L.Ed.2d 279, 289–290 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–855, 28 L.Ed.2d 158, 165–166 (1971); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, 284 (1969); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965).

Appellants suggest that the Comptroller's clearance regulations reflect a contemporaneous interpretation of § 3512 that includes a third statutory review criterion, "appropriateness." The regulations simply refer to a determination that the forms are "appropriate for collection of the information sought," 4 C.F.R. §§ 10.7, 10.12 (1976). We find no greater support for appellants' expansive construction of this language in the regulations than in the statute itself. Moreover, the agency's statement at the time these regulations were proposed reflects a contemporaneous interpretation of the statute by the Comptroller that comports with his present view, and to which we give the appropriate deference. 39 Fed. Reg. 2436 (1974).

**147.** Letter from Monte Canfield, Jr., Director of the General Accounting Office, to FTC Chairman Engman (Aug. 18, 1975) (LB App. 798–802).

On July 1, 1975 the FTC submitted the 1974 LB form to the Comptroller (LB App. 2025). The GAO published the proposed form in the Federal Register on July 8, 1975, 40 Fed.Reg. 28677, soliciting comments from interested persons. The 1974 LB form was cleared for use by the FTC in a letter dated August 18, 1975 from Monte Canfield, Jr., Director of the GAO, to FTC Chairman Engman (LB App. 798–802). See Affidavit of Carl F. Bogar, Asst. Director, Procurement Systems & Acquisition Div., GAO (LB App. 2019).

The Comptroller's August 18 letter indicated that revisions in the LB form for 1973 had improved, in the Comptroller's view, the meaningfulness of the data to be collected. The Comptroller expressly indicated, however, that his views were advisory and not within the standards of review provided by § 3512 (LB App. 801–802).

**148.** 44 U.S.C. § 3512(d) (Supp. V 1975).

**149.** Joint Appellants LB Brief at 72.

plans of the federal regulatory agencies.[150] Prior to the 1973 amendment, the regulatory agencies were subject to the clearance authority of the Office of Management and Budget (OMB), which continues to serve this function *vis-a-vis* nonregulatory agencies.[151] Congress' express purpose in establishing a different review process for the regulatory agencies was

> to insure that the existing clearance procedure for questionnaires or requests for data does not become, inadvertently or otherwise, a device for delaying or obstructing the investigations and data collection necessary to carry out the important regulatory functions assigned to the independent agencies by the Congress.[152]

Prior to the 1973 amendment, the OMB possessed authority to undertake a substantive appraisal of the data that a regulatory agency sought and to bar collection upon a finding that the data were not necessary for effectuation of the agency's function or the particular program's purpose.[153] Congress regarded the evaluation of the regulatory agency's need for data as essentially a policy determination and considered the re-

viewing agency's veto power as a source of interference with the independence of the regulatory agencies.[154] So in creating a separate clearance procedure for these agencies, Congress specifically provided in Section 3512(d) that "the independent regulatory agency shall make the final determination as to the necessity of the information in carrying out its statutory responsibilities and whether to collect such information."[155] Appellants' construction of "appropriateness" as a requirement that the Comptroller evaluate the data sought in terms of the agency's need is untenable in light of this provision reserving for the agency the determination as to the necessity of the information in carrying out its statutory responsibilities.[156] We therefore agree with the District Court[157] and the Comptroller General that the term "appropriateness" serves as merely a shorthand reference to the requirement of Section 3512(b)[158] that the Comptroller inspect the regulatory agency's information-gathering proposal with a view toward minimizing the compliance burden.[159]

**150.** Pub.L. No. 93–153, Title IV, § 409(b), 89 Stat. 593 (1973), codified at 44 U.S.C. § 3512 (Supp. V 1975).

**151.** *Id.* The OMB's clearance authority is defined by 44 U.S.C. §§ 3501–3511 (Supp. V 1975).

**152.** H.R.Rep.No.93–624, 93d Cong., 1st Sess. 31 (1973), U.S.Code Cong. & Admin.News 1973, pp. 2417, 2533.

**153.** 44 U.S.C. § 3506 (Supp. V 1975) provides:
> Upon the request of a party having a substantial interest, or upon his own motion, the Director of the Bureau of the Budget may determine whether or not the collection of information by a Federal agency is necessary for the proper performance of the functions of the agency or for any other proper purpose. Before making a determination, he may give the agency and other interested persons an opportunity to be heard or to submit statements in writing. To the extent, if any, that the Director determines the collection of information by the agency is unnecessary, for any reason, the agency may not engage in the collection of the information.

**154.** Senator Bentsen, author of the enacted amendment, made the following statement on

the Senate floor at the time of the amendment's passage:
> Unlike the previous oversight by OMB the GAO (Comptroller) would not make the final decision as to whether the information was needed. That decision would be left with the independent agency. My feeling was that if the General Accounting Office were given veto power over whether information was needed, it is putting them in the policy-decision framework, and I do not think that should be done.

119 Cong.Rec. 24085 (1973). See also *id.* at 23884–23885.

**155.** 44 U.S.C. § 3512(d) (Supp. V 1975).

**156.** Statutes must be construed when possible to avoid disharmony among their provisions.

**157.** 432 F.Supp. at 307–310 (LB App. 227–30).

**158.** 44 U.S.C. § 3512(b) (Supp. V 1975) quoted in full, text *supra* at 50–51.

**159.** Appellants suggest an alternative theory of statutory construction in support of their claim that the Comptroller is required to analyze the meaningfulness or reliability of the requested data to the agency's stated need. They suggest that the burden inquiry of § 3512(b) should

## III. CONCLUSION

The judgment of the District Court is affirmed. The corporate parties shall comply with the Line of Business and Corporate Patterns Report orders as issued by the Federal Trade Commission within 30 days of the date of this opinion.

*So ordered.*

---

entail a "cost-benefit" analysis balancing the cost to the reporting companies with the benefit to the agency. Since the result of appellants' assertion is inconsistent with the delegation to the agency of the determination of its necessity for the data, we reject the "cost-benefit" theory on the same grounds on which we relied to reject the "appropriateness" theory.

The Commission and the Comptroller raise several additional issues. Both contend that the Comptroller's actions under the Federal Reports Act are not subject to judicial review. Their argument is that by limiting the period of time in which the Comptroller can review regulatory information-gathering forms to 45 days, 44 U.S.C. § 3512(d) (Supp. V 1975), Congress intended to preclude judicial review. See *Morris v. Gressette*, 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977); *Harris v. Bell*, 183 U.S. App.D.C. 253, 562 F.2d 772 (1977). The Commission also suggests that the Comptroller's clearance function is agency action committed to agency discretion and therefore exempt from judicial review under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2) (1976). The District Court rejected this argument, 432

F.Supp. at 307–308. But see *General Electric Co. v. FTC*, 411 F.Supp. 1004, 1006 (N.D.N.Y. 1976); *Westinghouse Electric Corp. v. FTC*, 1976–1 Trade Cas. 68,815 (S.D.Ohio 1976). The Commission also suggests that the express purpose of the Federal Reports Act to protect "especially small business enterprises," 44 U.S.C. § 3512(a) (Supp. V 1975), excludes the large corporate appellants from the Act's zone of interest, thereby depriving them of standing to challenge the Comptroller's clearance of the LB form. See *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). Finally, the Commission contends that the challenge to the Comptroller's clearance is not properly raised as a defense in an enforcement proceeding, *FTC v. Texaco, Inc., supra* note 90, 180 U.S.App.D.C. at 407, 555 F.2d at 879. Since we conclude that the arguments made by the corporations with respect to the Comptroller's exercise of his review and clearance authority under the Federal Reports Act are clearly lacking in merit, we need not consider the various theories propounded by the FTC and the Comptroller.